UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

UNITED STATES OF AMERICA

v.

CASE NO. 6:26-cr-00159-CEM-DCI
18 U.S.C. § 371

LAURENT CASSAGNOL
HERIBERTO L. RIVERA

### INFORMATION

The United States Attorney charges:

## COUNT ONE
### (Conspiracy to Pay and Receive Health Care Kickbacks)

### A.  Introduction

At all times material to this Information:

### The Veterans Affairs Community Care Program

1.      The United States Department of Veterans Affairs ("VA") provided a variety of services and benefits, including health care services, to veterans, their families, and their survivors. Individuals receiving VA health care benefits and services were referred to as "VA patients."

2.      Among other health care services, the VA provided and administered the Community Care Program ("VA Community Care Program"), which was established by the VA Maintaining Internal Systems and Strengthening Integrated Outside Networks ("MISSION") Act of 2018.

1

3.     The purpose of the VA Community Care Program was to provide VA patients with access to timely, high-quality health care through community health care providers when the VA could not otherwise provide the needed care.

4.     The VA Community Care Program was a "health care benefit program," as defined by 18 U.S.C. § 24(b), that affected commerce, and a "Federal health care program," as defined by 42 U.S.C. § 1320a-7b(f), that affected commerce.

5.     The VA Community Care Program was administered on behalf of the VA by various third-party administrators across the United States. Between May 2019 and February 2020, Tri-West Healthcare Alliance ("Tri-West") administered the VA Community Care Program in Florida. Beginning in February 2020, and continuing through at least December 2025, Optum Serve ("Optum") administered the VA Community Care Program in Florida.

6.     For medical providers ("providers") to bill the VA Community Care Program for services rendered, they were required to enroll with the Community Care Network ("CCN"). Providers enrolled in the CCN by entering into an agreement with the third-party administrator. Once the provider entered into an agreement with the third-party administrator, the provider was often referred to as a "community provider."

7.     Community providers submitted claims to the third-party administrator for reimbursement from the VA Community Care Program. Claims were generally

2

submitted electronically within 30 days after rendering services. There was a 180-day timely filing limit, and providers had 90 days to appeal or re-submit a claim.

8.    In becoming a community provider, enrolled providers agreed to abide by the policies, procedures, rules, and regulations governing reimbursement. Community providers were given, and provided with online access to, Optum and Tri-West manuals describing proper billing procedures and billing rules and regulations. Optum's Provider Agreement required providers to comply with all regulatory requirements and applicable laws. Tri-West's Terms and Conditions stated that it was subject to all applicable laws. The Federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b, was a federal law in effect at all relevant times.

9.    The VA Community Care Program would not pay claims for services and supplies that were procured through kickbacks and bribes. By implementing these restrictions, the VA Community Care Program aimed to preserve its resources, which were largely funded by U.S. taxpayers, for those qualifying veterans who had a genuine need for medical services.

<u>The Defendants and Relevant Entities</u>

10.    Defendant LAURENT CASSAGNOL ("CASSAGNOL") was a resident of Orange County, Florida. CASSAGNOL worked as an Advanced Medical Support Assistant for the VA Community Care Program in Orlando, Florida.

11.    LC Management Group LLC ("LC MANAGEMENT") was a company located in Orlando, Florida. CASSAGNOL was the owner of LC MANAGEMENT.

3

12.    Defendant HERIBERTO L. RIVERA ("RIVERA") was a resident of Orange County, Florida.

13.    Family Integrative Medicine of Orlando, LLC ("FIMO") was an enrolled VA Community Care provider and a holistic medical clinic that provided services such as acupuncture and chiropractic adjustments. RIVERA was the Chief Executive Officer of FIMO.

### B.  The Conspiracy

14.    From in or around July 2019, and continuing through in or around December 2023, in the Middle District of Florida and elsewhere, the defendants,

LAURENT CASSAGNOL
and
HERIBERTO L. RIVERA,

did knowingly and willfully, that is, with the intent to further the objects of the conspiracy, combine, conspire, confederate, and agree with each other to commit offenses against the United States, that is:

a.    to violate Title 42, United States Code, Section 1320a-7b(b)(2)(A), by knowingly and willfully offering and paying any remuneration, including kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind, to a person to induce such person to refer an individual to a person for the furnishing and arranging for the furnishing of any item and service for which payment may be made in whole and in part by a Federal health care program, that is, the VA Community Care Program; and

b.    to violate Title 42, United States Code, Section 1320a-7b(b)(1)(A), by knowingly and willfully soliciting and receiving any remuneration, including kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind, in return for referring an individual to a person for the furnishing and arranging for the furnishing of any item and service for which payment may be made in whole and in part by a Federal health care benefit program, that is, the VA Community Care Program.

### C.    Purpose of the Conspiracy

15.    It was a purpose of the conspiracy for CASSAGNOL and RIVERA to unlawfully enrich themselves by, among other things: (a) offering and paying kickbacks and bribes to induce the referral of VA Community Care Program VA patients to FIMO; (b) soliciting and receiving kickbacks and bribes in exchange for the referral of VA Community Care Program VA patients to FIMO; (c) submitting and causing the submission of claims to the VA Community Care Program through FIMO that were procured through the payment of kickbacks and bribes; (d) concealing and causing the concealment of kickback and bribe payments; and (e) diverting the proceeds of the conspiracy for their personal use and benefit, the use and benefit of others, and to further the conspiracy.

### D.    Manner and Means of the Conspiracy

16.    The manner and means by which the defendants and their conspirators sought to accomplish the purposes of the conspiracy included, among others, the

following:

a.  It was part of the scheme that, by enrolling FIMO as a provider with the VA Community Care Program, RIVERA and FIMO agreed to comply with all VA Community Care Programs rules and regulations, including all regulatory requirements and applicable laws such as the Federal Anti-Kickback Statute.

b.  It was further a part of the scheme that CASSAGNOL formed LC MANAGEMENT to conceal the receipt of kickbacks and bribes from RIVERA.

c.  It was further a part of the scheme that, as an Advanced Medical Support Assistant for the VA Community Care Program, CASSAGNOL used his position to steer VA patients to RIVERA and FIMO in exchange for kickbacks and bribes from RIVERA.

d.  It was further a part of the scheme that RIVERA paid kickbacks and bribes to CASSAGNOL personally and through LC MANAGEMENT in the amount of at least $175,172, in exchange for the referral of VA Community Care Program VA patients to FIMO for holistic medical services, such as acupuncture and chiropractic adjustments.

e.  It was further a part of the scheme that CASSAGNOL and RIVERA disguised the nature and source of these kickbacks and bribes by

6

designating payments as purported legitimate services such as "marketing" or "consulting fees."

f. It was further a part of the scheme that, as a result of the kickbacks and bribes, CASSAGNOL and RIVERA denied the VA patients the ability to choose which holistic medical services provider to utilize.

g. It was further a part of the scheme that CASSAGNOL, RIVERA, and their co-conspirators caused FIMO to submit claims to the VA and VA Community Care Program that were procured through payment of kickbacks and bribes in at least the approximate amount of $14,080,969, of which approximately $11,948,349 was paid.

h. It was further a part of that scheme that CASSAGNOL, RIVERA, and their co-conspirators used the proceeds received from the VA and VA Community Care Program to benefit themselves and others, and to further the conspiracy.

### E.    Overt Acts

17. In furtherance of the conspiracy, and to accomplish its objects and purpose, at least one co-conspirator committed and caused to be committed, in the Middle District of Florida, at least one of the following overt acts, among others:

a. On or about August 5, 2021, RIVERA, through FIMO, paid CASSAGNOL, through LC MANAGEMENT, $1,075, which was a kickback and bribe in exchange for the referral of VA patients to FIMO.

b. On or about September 10, 2021, RIVERA, through FIMO, paid CASSAGNOL, through LC MANAGEMENT, $1,075, which was a kickback and bribe in exchange for the referral of VA patients to FIMO.

All in violation of Title 18, United States Code, Section 371.

## FORFEITURE

1. The allegations contained in Count One are incorporated by reference for the purpose of alleging forfeiture pursuant to 18 U.S.C. § 982(a)(7).

2. Upon conviction of a conspiracy to violate 42 U.S.C. §§ 1320a-7b(b)(1)(A), and/or 1320a-7b(2)(A), in violation of 18 U.S.C. § 371, the defendants shall forfeit to the United States, pursuant to 18 U.S.C. § 982(a)(7), any property, real or personal, which constitutes or is derived, directly or indirectly, from gross proceeds traceable to the offense.

3. The property to be forfeited by Defendant CASSAGNOL includes, but is not limited to, an order of forfeiture in the amount of at least **$175,172.39**, which represents the proceeds Defendant CASSAGNOL personally obtained as a result of the commission of the offense.

4. The property to be forfeited by Defendant RIVERA includes, but is not limited to, an order of forfeiture in the amount of at least **$515,542.68**, which represents the proceeds Defendant RIVERA personally obtained as a result of the commission of the offense.

5.      If any of the property described above, as a result of any act or omission of the defendants:

      a.      cannot be located upon the exercise of due diligence;

      b.      has been transferred or sold to, or deposited with, a third party;

      c.      has been placed beyond the jurisdiction of the court;

      d.      has been substantially diminished in value; or

      e.      has been commingled with other property which cannot be divided without difficulty,

the United States of America shall be entitled to forfeiture of substitute property under the provisions of 21 U.S.C. § 853(p), as incorporated by 18 U.S.C. § 982(b)(1).

GREGORY W. KEHOE
United States Attorney

By:   _____
Kara M. Wick
Chief, Health Care Fraud

LORINDA LARYEA
Chief
Criminal Division, Fraud Section
U.S. Department of Justice

By:   _____
Angela Benoit
Trial Attorney
Criminal Division, Fraud Section
U.S. Department of Justice